UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ROBERT T. TAYLOR,

      Petitioner,

v.                                  Case No. 3:16cv179/LC/CJK

JULIE L. JONES,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of habeas corpus filed under 28 U.S.C. § 2254, with supporting memorandum.  (Docs. 1, 2).  Respondent moves to dismiss the petition as untimely, providing relevant portions of the state court record.  (Doc. 14; *see also* Doc. 18 (re-filing of Respondent's Exhibit 2)).  Petitioner has replied.  (Doc. 17).  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B).  After careful consideration, the undersigned concludes that no evidentiary hearing is required for the disposition of this matter.  Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts.  The undersigned further concludes that the pleadings and attachments before the court show that the petition is untimely and should be dismissed.

## BACKGROUND AND PROCEDURAL HISTORY

Petitioner was arrested on July 27, 2006, and charged by amended information filed in Escambia County Circuit Court Case No. 06-CF-3199, with two counts of sexual battery (victim less than 12 years of age – Counts 1 and 2); one count of lewd and lascivious molestation (victim less than 12 years of age – Count 3); one count of sexual battery by a person in position of familial or custodial authority (victim over 12 years of age but less than 16 years – Count 4); and four counts of lewd and lascivious molestation (victim over 12 years of age but less than 16 – Counts 5-8). (Doc. 14, Ex. A, pp. 5-9 (arrest report), pp. 3-4 (amended information)).[1] The victim was petitioner's step-daughter, M.I. (*Id.*). Petitioner went to trial (Exs. B-E), and testified in his own defense (Ex. D, pp. 430-544 and Ex. E, pp. 548-553). The jury found petitioner guilty of Counts 1-3 as charged; guilty of the lesser included offense of battery on Count 4; not guilty of Counts 5, 6 and 7; and guilty of the lesser included offense of battery on Count 8. (Ex. A, pp. 66-67 (jury verdict), p. 68 (jury judgment)). A judgment of not guilty was entered on Counts 5, 6 and 7. (Ex. A, p. 112). Petitioner was adjudicated guilty on Counts 1, 2, 3, 4 and 8 pursuant to the jury's verdict, and was sentenced to concurrent terms of life in prison on Counts 1

---

[1] References to exhibits are to those provided at Docs. 14 and 18. Where a particular page of an exhibit has more than one page number, the court references the number appearing at the bottom center of the page.

and 2; a concurrent term of 15 years in prison on Count 3; and concurrent terms of 1 year in prison on Counts 4 and 8, to run concurrent with the sentences imposed on Counts 1 and 2. (Ex. A, pp. 115-123). The Florida First District Court of Appeal (First DCA) affirmed the judgment on December 15, 2009, per curiam and without a written opinion. *Taylor v. State*, 27 So. 3d 664 (Fla. 1st DCA 2009) (Table) (copy at Ex. I). Rehearing was denied on February 4, 2010. *Id*. (copy at Ex. K). Petitioner did not seek further review. (*See* Doc. 1, pp. 3, 4).[2]

On August 29, 2011, petitioner, through counsel, filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Ex. M, pp. 33-46). Petitioner filed an amended motion on April 9, 2012 (Ex. M, pp. 61-85). The state circuit court granted an evidentiary hearing as to claims 1, 2, 4 and 5. (Ex. M, pp. 89-90). After the hearing (Ex. M, pp. 93-154; Exs. N-O), the circuit court issued a written order denying postconviction relief. (Ex. P, pp. 423-622 and Ex. Q, pp. 623-654). The First DCA affirmed, per curiam and without a written opinion. *Taylor v. State*, 160 So. 3d 418 (Fla. 1st DCA 2015) (Table) (copy at Ex. V). The mandate issued March 23, 2015. (Ex. Y).

---

[2] Citations to page numbers of the petition are to those appearing at the top right corner of the petition itself, not to the page number assigned by the court's electronic docketing system.

Petitioner filed his federal habeas petition on April 20, 2016. (Doc. 1, p. 16; *see also* institutional date stamp at Doc. 1, Attach., p. 162 in ECF). Respondent asserts the petition is untimely and should be dismissed. (Doc. 14).

DISCUSSION

Because petitioner filed his § 2254 petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA governs this petition. *Lindh v. Murphy*, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). AEDPA establishes a 1-year period of limitation for a state prisoner to file a federal application for a writ of habeas corpus. 28 U.S.C. § 2244(d)(1). The limitations period runs from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

§ 2244(d)(1).  The limitations period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending".  28 U.S.C. § 2244(d)(2).

Petitioner concedes that his petition is untimely (doc. 1, p. 14), but asserts that his claims should be considered on the merits because he is actually innocent.  (Doc. 1, pp. 14-15; Doc. 17).  Petitioner presents seven contentions to support his claim of actual innocence (*id*.), and provides 160 pages of documents.  (Doc. 1, App. A-J).

Actual innocence, if proved, serves as a gateway through which a federal habeas petitioner may pass to overcome a statute of limitations bar to consideration of the merits of his constitutional claims.  *McQuiggin v. Perkins*, — U.S. —, 133 S. Ct. 1924, 1928, 185 L. Ed. 2d 1019 (2013).  "[T]enable actual-innocence gateway claims are rare".  *Id*., 133 S. Ct. at 1928.  The petitioner must make a threshold showing that satisfies the *Schlup* standard – the standard of proof governing procedural claims of actual innocence.  *McQuiggin*, 133 S. Ct. at 1928 (*citing Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)).  The *Schlup* standard requires the habeas petitioner to demonstrate that constitutional error "probably resulted" in the conviction of one who is actually innocent.  *Id*., 513 U.S. at 324, 326-27.  A mere allegation of innocence is not enough; "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with

new reliable evidence – whether it be exculpatory scientific evidence, trustworthy

eyewitness accounts, or critical physical evidence – that was not presented at trial.

Because such evidence is obviously unavailable in the vast majority of cases, claims

of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

The new evidence "must do more than counterbalance the evidence that

sustained the petitioner's conviction." *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672

F.3d 1000, 1016-1017 (11th Cir. 2012). "The new evidence must be so significant

and reliable that, considered with the trial record as a whole, it 'undermine[s]

confidence in the result of the trial' such that 'it is more likely than not that no

reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"

*Rozzelle* at 1017 (*quoting House v. Bell*, 547 U.S. 518, 537, 126 S. Ct. 2064, 165 L.

Ed. 2d 1 (2006)); *see also Schlup*, 513 U.S. at 329 ("[A] petitioner does not meet the

threshold requirement unless he persuades the district court that, in light of the new

evidence, no juror, acting reasonably, would have voted to find him guilty beyond a

reasonable doubt."). The Court in *House* described a habeas court's analysis as

follows:

> [T]he habeas court must consider all the evidence, old and new,
> incriminating and exculpatory, without regard to whether it would
> necessarily be admitted under rules of admissibility that would govern
> at trial. Based on this total record, the court must make a probabilistic
> determination about what reasonable, properly instructed jurors would
> do. The court's function is not to make an independent factual

determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

. . . .

. . . Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial.

*House*, 547 U.S. at 538-539 (internal quotation marks and citations omitted). As the Court in *McQuiggin* summarized: "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin*, 133 S. Ct. at 1936 (*quoting Schlup*, 513 U.S. at 316); *see also House*, 547 U.S. at 538 (emphasizing that the *Schlup* standard is "demanding" and seldom met).

To focus this court's analysis, the undersigned clarifies the offenses for which petitioner is in custody. Petitioner is in custody for his convictions of Counts 1-3, specifically: (1) sexual battery on M.I. (between 1/19/1999 and 1/18/2003) when M.I. was less than 12 years of age by penile/vaginal penetration or union (Count 1); (2) sexual battery on M.I. (between 1/19/1999 and 1/18/2003) when M.I. was less than 12 years of age by digital/vaginal penetration (Count 2); and (3) lewd and lascivious molestation of M.I. (between 1/19/1999 and 1/18/2003) when M.I. was

less than 12 years of age by fondling her genitals, buttocks and/or breasts (Count 3). (Doc. 14, Ex. A, pp. 3-4 (amended information), and pp. 66-67 (jury verdict)).[3] The sexual batteries and molestation forming the basis for Counts 1-3 occurred on a boat, in petitioner's hot tub and the adjoining deck, in a storage building next to petitioner's house, in M.I.'s bed, and when M.I. was in the shower. (*See* Ex. C, pp. 229-38 (M.I.'s direct testimony)).

Petitioner presents his "gateway" claim of actual innocence as Ground Four of his federal habeas petition. Ground Four has seven "sub-claims" or contentions. (Doc. 1, pp. 11-11(i) (petition); Doc. 2, pp. 11-16 (supporting memorandum)). Each contention will be addressed in turn.

"Sub-Claim 4A:    The Petitioner is actually and factually innocent as the Petitioner could not have physically fit into the cabin of the boat." (Doc. 1, p. 11(a)).

Petitioner alleges the following facts to support this claim:

> The allegations by the alleged victim about the alleged first time on the boat CHANGED from her original statement to her testimony at trial which ties into the sub-claim pertaining to the DVD. In the alleged victim's original statement memorialized on DVD, she alleged that the Petitioner and herself had sex in the cabin of the boat. This was physically impossible which the State figured out and the alleged victim changed her alleged story. As the pictures of the boat's cabin clearly

---

[3] Petitioner's remaining two convictions were for the lesser included offenses of simple battery on Counts 4 and 8, specifically: batteries on M.I. (between 1/19/2003 and 6/30/2005) when M.I. was between 12 and 16 years old. (Doc. 14, Ex. A, pp. 3-4 (amended information), and pp. 66-67 (jury verdict)). The concurrent 1-year sentences imposed for those convictions have expired.

show, these allegations were not physically possible for the Petitioner
to have committed.  (See Appendix A and C).

(Doc. 1, p. 11(a)).   Petitioner submits photographs of the boat to support his

allegation that it was not physically possible for him (much less him and M.I.) to fit

inside the cabin of the boat.  (Doc. 1, App. A).  Some of the photographs are the

same as those admitted into evidence at trial as State's Exhibits 5 and 6.  (Doc. 1,

App. A; Ex. C, p. 233).  Petitioner provides additional photographs of the boat cabin,

some of which were received as exhibits at the pre-trial deposition of Gerald Lagos

conducted on January 4, 2007, but not admitted into evidence at trial, and others of

which were defense exhibits marked at trial but not admitted into evidence.  (Doc.

1, App. A; *see also* Doc. 1, App. C (transcript of Lagos deposition) and Doc. 14, Ex.

C (trial transcript indicating which defense exhibits were marked but not admitted

into evidence)).   As additional support for his allegation, petitioner submits the

deposition transcript of Gerald Lagos to show that Mr. Lagos "would have testified

that it was physically impossible for anyone, let alone the Petitioner to have sex in

the cabin of the boat."  (Doc. 1, p. 11(g); Doc. 1, App. C (Lagos deposition

transcript)).  Petitioner also submits what he describes as the "Excerpt from DVD"

(doc. 1, Table of Appendices), which is an alleged transcription of the relevant

statement M.I. made during her original, videotaped interview.  Petitioner asserts

that M.I. said:  "The old boat, um, it just had like the cabin in it, you couldn't, it was

like something you could like step down to it. You couldn't stand up in it, it was just, you lay down in it and that was it." (Doc. 1, Ex. F).

The court has considered petitioner's new evidence along with other relevant evidence, including the trial transcript. The trial transcript establishes that M.I. testified on direct examination that the first instance of penile/vaginal penetration or union occurred on petitioner's boat (a boat owned by petitioner's father but used by petitioner). (Ex. C, pp. 235-238). M.I. described the particular area of the boat where the sexual battery took place: "[A]ttached to the front of the boat, where the windshield is, the old boat, there is a Bimini. And Bob took sheets and attached them to the Bimini and tucked them in the metal bars and put clothes pins on them so they'd stay and then laid mats out. . . . I laid down on the mats, and Bob climbed on top of me. . . ." (Ex. C, p. 235).

On cross-examination, defense counsel questioned M.I. concerning the particular location – on the boat – where the sexual batteries occurred, including whether they occurred <u>inside</u> the cabin of the boat and whether M.I. previously stated in her initial videotaped interview that they occurred inside the cabin:

A. [M.I.] It happened in the boat.

Q. [Defense Counsel] Why did you describe the boat and talk so much about the cabin?

A. On the old boat, there is not much of a cabin.

Q.  Well, didn't you give everybody the impression that this sexual intercourse had taken place in this cabin?

A.  No, sir, I did not.

Q.  Didn't you tell them that you had – that he had put the sheets and the floats, the mattresses, and all of that stuff in the cabin?

A.  No, sir, I did not.

Q.  And if the sheriff's officer, Ms. Tammy Barber – do you remember talking to her?

A.  Yes, sir.

Q.  Did she take notes when you talked to her?

A.  Yes, sir.

Q.  Did she do a videotape of your testimony?

A.  Not that I know of.

Q.  Did you go in a special room with just her?  Did she ask you about things?

A. It was me, her, and my father.

Q.  Now, the boat that we're talking about, you're talking about the small boat?

A.  Yes, sir.

Q.  And so you're saying it took place actually outside the little cuddy cabin?

A.  Yes, sir.

Q. And I think I've asked you basically to tell us where.

A. Yes, sir.

Q. And would you tell us where?

A. Under – under the Bimini.

Q. Under the Bimini top?

A. Yes, sir.

Q. And were you lying – you said you were laying on your back?

A. Yes, sir.

Q. Were you in line with the boat or were you crossways to the boat?

A. We were more sideways, heads up next to the cooler, feet coming down – I don't know how far up the chair by the steering wheel is.

(Ex. C, pp. 273-275).

Given M.I.'s trial testimony that the sexual intercourse occurred <u>outside</u> the cabin, petitioner's "new evidence" purportedly showing that he could not have fit <u>inside</u> the cabin would not likely cause a reasonable juror to have reasonable doubt about his guilt. Further, given defense counsel's attempt to impeach M.I.'s credibility with the same statement petitioner now uses to support his claim of actual innocence, and given the jury's finding of guilt despite that attempt, petitioner has not persuaded the court that, in light of petitioner's new evidence, "it is more likely

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Petitioner's Sub-Claim 4A fails.

"Sub-Claim 4B:     The Petitioner is actually and factually innocent which is proven by the physical examination of Dr. Julie De Cesare which was done when the alleged victim was 11 years and 7 months old." (Doc. 1, p. 11(a)).

Petitioner describes the substance of Dr. DeCesare's testimony as follows:

> Dr. Julie De Cesare physically examined the alleged victim and testified at the [postconviction] evidentiary hearing that it was impossible for the alleged victim to have been having sexual encounters with the Petitioner and show absolutely ZERO signs of trauma. . . . It should be said and noted, at the evidentiary hearing, post-conviction counsel, did everything but pour gas on the "good doctor" and strike a match to make her finally tell the truth again. ([T]here would be signs of abuse and she found none) (See Record on Appeal pages 107-124)

> Counsel "exposed" the lies the doctor had said earlier, and the only one at the hearing that did not see that "very clearly" was the judge that presided over the hearing. (Please review what was presented to the DCA on this ground)

(Doc. 1, pp. 11(a)-11(b)). Evidence of Dr. DeCesare's examination of M.I. and what her trial testimony would have been was an issue fleshed out at petitioner's postconviction evidentiary hearing, because one of petitioner's claims (Ground Two of his amended Rule 3.850 motion) asserted he had newly discovered evidence that Dr. DeCesare "did not believe that [M.I.] was having intercourse with anyone during the time period of the allegations" and that defense counsel was ineffective in releasing Dr. DeCesare from her trial subpoena. (*See* Ex. M, pp. 64-65 (petitioner's

amended Rule 3.850 motion)).  The record of the postconviction evidentiary hearing reveals the following.

Dr. DeCesare was deposed prior to trial.  (Ex. M, pp. 97, 279; *see also* Ex. P, pp. 614 – 622 and Ex. Q, pp. 623-34 (DeCesare deposition transcript)).  In that deposition, DeCesare stated that she did an external visual examination of M.I.'s genitalia in response to M.I.'s mother reporting that M.I. was having "period problems" or menstrual irregularities.  M.I.'s external genitalia appeared normal.  Dr. DeCesare did not perform a pelvic or other internal examination of M.I.  (*See* Ex. M, pp. 109-139 (transcript of Dr. DeCesare's postconviction evidentiary hearing testimony); Ex. P, pp. 614-22 through Ex. Q, pp. 623-633 (transcript of Dr. DeCesare's pre-trial deposition testimony)).  Dr. DeCesare did not look internally at M.I.'s hymen.  (Ex. M, pp. 116, 138-139).  When Dr. DeCesare was asked at petitioner's postconviction evidentiary hearing:  "[W]ould you ever have been able to testify that [M.I.] was not engaging in sexual intercourse and that she had not been vaginally penetrated and was in fact a virgin?  Would you ever have been able to testify to that?" (Ex. M, p. 139); Dr. DeCesare responded:  "No, there is no way I could testify to that."  (*Id.*).  Petitioner's trial counsel (Attorney Richbourg) testified at petitioner's postconviction evidentiary hearing that he deposed Dr. DeCesare and that he chose not to present her as a witness because "she was no help".  (Ex. M, p.

280). Attorney Richbourg explained that prior to trial, petitioner reported that Dr. DeCesare had examined M.I. and could testify that M.I. had not been sexually active. (Ex. M, p. 279). Based on that information, Richbourg deposed Dr. DeCesare and inquired whether DeCesare could provide that testimony – that M.I. had not been sexually active. Richbourg learned at the deposition that Dr. DeCesare could <u>not</u> testify as petitioner proposed. Richbourg explained, "[Dr. DeCesare] said that she just did an external exam. And I don't have access to that deposition. But I may have asked her if she used a speculum or if she did anything to enter the vaginal cavity or whatever, to make an examination, and whatever it was, she made it clear that she didn't do any of the [sic] that. She strictly just looked from the outside. She had no reason to do anything other, from what I understood." (Ex. M, pp. 279-280, 282). Although Richbourg subpoenaed Dr. DeCesare for trial, he did not call her as a witness because "[s]he was worthless" as a defense witness and because she called him shortly before trial and asked to be released due to long-standing vacation plans. (Ex. M, pp. 281-282). Richbourg testified: "Number one, she wasn't going to be any help. Number two, if I forced her away from her planned vacation . . . I would have a no help witness, who was going to be mad, and that scared me because I had no idea then what she might say if we put her up there." (*Id.*). As the postconviction

trial judge noted in her order denying petitioner's claim of newly discovered evidence/ineffective assistance of counsel:

> Dr. DeCesare has consistently testified that she did not do an internal exam of the victim, and therefore she would not have been able to testify as to whether the victim was sexually active.FN19 . . . [H]er testimony would not have been exculpatory as Defendant allegesFN20[.]
>
> FN19  Although this point was argued by Defendant at the evidentiary hearing, he offered no evidence to support his assertion that a doctor could conclude whether a female is a virgin by an external visual examination.  In fact, Dr. DeCesare stated specifically in her deposition that she would have needed to insert a speculum to make such a determination, which she did not do.
>
> FN20  As Mr. Richbourg commented at the evidentiary hearing, "We needed a home run and that [the testimony of Dr. DeCesare] wasn't even a bunt."  <u>See</u> evidentiary hearing transcript (1/25/13), p. 160.

(Ex. P, p. 429).

Petitioner's proposed "new evidence" of his actual innocence – Dr. DeCesare's testimony concerning the results of her external visual examination of M.I. – does not meet the *Schlup* standard.  Petitioner has not shown that had the jury heard DeCesare's testimony, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt".  *Schlup*, 513 U.S. at 329.

"Sub-Claim 4C:    The Petitioner is actually and factually innocent which is proven
                  by phone records." (Doc. 1, p. 11(b)).

Petitioner alleges that M.I. "made some specific date allegations for which the

Petitioner could PROVE with the phone records could NEVER have happened."

(Doc. 1, p. 11(b)).   Petitioner admits that "these phone records were entered as

Exhibits at trial", but argues that they qualify as newly discovered evidence because

they "did not get sent back with the jury or be included in the record on appeal."

(Doc. 1, p. 11(b); *see also* Doc. 14, Ex. D, pp. 477-88 (trial transcript where phone

records were admitted into evidence as defense exhibits)).   Petitioner attaches the

particular phone records.   (Doc. 1, Appendix B).   The fact that the phone records

were presented at trial removes them from *Schlup*'s definition of "new evidence".

*Schlup*, 513 U.S. at 324 (holding that a gateway claim of actual innocence requires

a petitioner to "support his allegations of constitutional error with new reliable

evidence . . . that was not presented at trial") (emphasis added).

"Sub-Claim 4D:    The Petitioner is actually and factually innocent as the alleged
                  first sexual experience with a male was [T.A.] when the alleged
                  victim was 13 years old." (Doc. 1, p. 11(c)).

Petitioner alleges that M.I.'s "first sexual experience with a male was [T.A.]

when the alleged victim was 13 years old.  [R.L.] was the first female."  (Doc. 1, p.

11(c)).  Petitioner alleges that although R.L. "wanted nothing to do with this case",

she is a source of evidence of petitioner's actual innocence, because she, as a teen,

performed sexual acts on M.I. when M.I. was in the seventh grade and "knew that the alleged victim in this case was a virgin then." (Doc. 1, p. 11(c)). Petitioner does not provide an affidavit from R.L. or any other form of credible evidence to substantiate his allegation. Petitioner also fails to provide credible evidence that R.L. had personal knowledge, or was otherwise qualified to make a determination that M.I. had not engaged in sexual intercourse at that time.

Petitioner further alleges that M.I. "lost her virginity to [T.A.]" when she was 13 years old, but again, petitioner provides no affidavit from T.A., nor does he provide credible evidence that at the time T.A. had the alleged sexual intercourse with M.I., he had personal knowledge, or was otherwise qualified to make a determination that M.I. had not engaged in sexual intercourse before. Petitioner believes T.A.'s credibility is supported by the fact that T.A. "bragged about his 'conquest' at school", and by the fact that M.I.'s biological father "blurted out" to M.I.'s biological mother and others in 2004, that "the alleged victim in this case had just lost her virginity to [T.A.]." (Doc. 1, p. 11(c)). Again, petitioner provides no affidavit from the biological father, nor does petitioner provide credible evidence that M.I.'s biological father had personal knowledge, or was otherwise qualified to make a determination that M.I. had not had sexual intercourse prior to her conduct with T.A.

Petitioner's self-serving allegations could not be more speculative or unreliable. Petitioner has not presented any actual evidence in connection with Sub-Claim 4(D). There is no basis for this court to conclude that it is reasonably probable R.L. or T.A. would testify as petitioner suggests. Even if petitioner presented affidavits from R.L. and T.A. testifying that they engaged in sexual acts or intercourse with M.I., their lay opinions as to whether M.I. was a virgin at the time would carry little, if any, weight. Petitioner's allegations are far from the type of "reliable evidence" *Schlup* requires. *See, e.g., Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004) (rejecting actual innocence claim where petitioner presented no evidence, by affidavit or otherwise, to show what the purported witness would, in fact, have testified; stating: "Sibley's actual innocence claim is hindered at the outset by a fatal shortcoming – he has not presented any actual evidence to the district court. He is not privy to the contents of Motley's personnel file and offers no affidavits from either his stepson or wife. Consequently, he has provided no basis upon which a court can second-guess the jury's verdict."). Petitioner cannot "bootstrap the right to an evidentiary hearing from this paucity of evidence." *Sibley*, 377 F.3d at 1206.

"Sub-Claim 4E:  The Petitioner is actually and factually innocent as the original DVD of the alleged victim proves beyond any doubt." (Doc. 1, p. 11(d)).

This contention involves the same DVD (videotaped recording of M.I.'s original interview) that petitioner discussed in Sub-Claim 4A. Petitioner alleges that the DVD "shows that the Petitioner did not commit the erroneous allegations because it was physically impossible." (Doc. 1, p. 11(e)). Petitioner also brings up Mr. Lagos' deposition testimony concerning the size of the inside of the cabin of the boat, as discussed in Sub-Claim 4A above. In addition, petitioner alleges that during the videotaped interview of M.I., "it is stated, that a secretary at the plumbing company, Jessica Murphy, had talked to the alleged victim in June of 2005 and had asked if the Petitioner had ever touched her. She denied he had." (Doc. 1, p. 11(e)). Petitioner goes on to accuse M.I.'s biological father of molesting an 8-year old girl when he was 13 or 14 years old. (Doc. 1, p. 11(f)). Petitioner ends by alleging that owners of the Daybreak Marina would have testified that they did not meet petitioner until 3½ years after the sexual battery forming the basis of Count 1, and that contrary to M.I.'s trial testimony, there was no boat ramp or launch at the Daybreak Marina in 2001.

During trial, defense counsel Richbourg pointed out during cross-examination of M.I. that Daybreak Marina did not have a boat launch in January of 2001, the time

petitioner first had sexual intercourse with M.I. (Ex. C, p. 277). In addition, petitioner testified at trial that he never launched his boat from Daybreak Marina and that the marina did not have a launch. (Ex. D, pp. 474-475). The jury convicted petitioner in spite of such evidence.

Petitioner's proffer of the DVD and the Lagos deposition transcript are of no help to him, as discussed in Sub-Claim 4A, above. Taking petitioner's remaining allegations at face value, the purported fact that M.I. did not disclose petitioner's abuse to petitioner's secretary, the allegation against M.I.'s biological father, and the purported fact that Daybreak Marina did not have a boat launch in January of 2001 (a "fact" the jury heard), does not persuade this court that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [petitioner] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

"Sub-Claim 4F:    The Petitioner is actually and factually innocent and testimony of ex-city cop Darren Moody could have help[ed] prove the facts." (Doc. 1, p. 11(h)).

Petitioner alleges that Darren Moody, who was listed as a defense witness but not called to testify, would have testified as follows:

> He executed the search warrant in 2002 and would have testified that there was absolutely no type of bedding, mats or anything else of that nature in the shop where he conducted the search. He also would have testified that the window that the alleged victim claimed she climbed through would only open 4½ inches. He also would have testified about

the wires not being hooked up to the hot tub, that Kevin Maloney had
ran to the pump area in 2003.

(Doc. 1, p. 11(h)).  As with petitioner's other proposed witness testimony, petitioner

provides no affidavit from Mr. Moody to support his allegations as to what Mr.

Moody would testify.  *See Sibley*, 377 F.3d at 1206.  Additionally, the search warrant

to which petitioner is referring is discussed in detail below.  According to the

documentation petitioner has provided (doc. 1, App. E), the search warrant was

related to petitioner's arrest on weapons and drug charges.  (Doc. 1, App. E).  There

was no allegation of sexual abuse, and thus no reason for officers executing the

warrant to look for mats or bedding, or to investigate whether the hot tub was

functional and how far a window would open.

Of even greater damage to petitioner's contention is the fact that the jury who

found petitioner guilty of the sexual batteries and molestation occurring between

1/19/1999 and 1/18/2003, heard the substance of the testimony petitioner now

proposes.  Petitioner testified at trial to the substance of Mr. Moody's proposed

testimony.  (Ex. D, pp. 444-49 (hot tub), pp. 450-55 (window)).  In fact, petitioner

even testified to Mr. Moody coming over and testing how far the window could be

opened.  (Ex. D, pp. 461-462).  In addition, two defense witnesses testified to the

substance of Moody's proposed testimony.  Defense witness Emory Ingram testified

concerning how far the window could open (Ex. C, pp. 327-329), and the hot tub

(Ex. C, pp. 341-42, 349). Defense witness Deon Booker testified concerning the hot tub (Ex. D, pp. 386-87) and the window (Ex. D, p. 389, 399). Petitioner's "new evidence" of Mr. Moody's proposed testimony is largely cumulative of what the jury heard, and petitioner has not made a sufficient showing that it is more likely than not that no reasonable juror would have convicted him had the jury heard the additional testimony. Petitioner's Sub-Claim 4F fails.

"Sub-Claim 4G:    The Petitioner is actually and factually innocent and records from Florida Department of Children and Families would have cast serious doubt on these allegations." (Doc. 1, p. 11(h)).

Petitioner's final piece of evidence involves records of the Florida Department of Children and Families (DCF) from October 2002, concerning an investigation DCF conducted after petitioner was arrested on September 7, 2002 for controlled substance and weapons offenses. (Doc. 1, App. E). Petitioner claims the DCF report would have "cast serious doubt" about whether he committed the sexual batteries and molestation against M.I. (Doc. 1, pp. 11(h)-11(g)).

A review of the DCF report establishes that it was generated based on three categories of allegations: "Conditions Hazardous to Health", "Substance Exposed Child" and "Deadly Weapon Injury". (Doc. 1, App. E, p. 78 in ECF). After a search warrant was executed at petitioner's residence, he and M.I.'s mother were arrested for unsafe storage of a firearm, possessing 6 pounds of marijuana, possessing 6

marijuana plants that exceeded 10 feet in height, and possession of a controlled substance within 1000 feet of a place or worship. (Doc. 1, App. E, pp. 72-77 in ECF). There was no allegation of sexual abuse at that time. The DCF records show that DCF visited petitioner's home and determined that it presented a "low" risk to M.I. The report concluded:

> IA [Initial Assessment]: Risk is low. Incident [petitioner's arrest on drugs and weapons charges] happened over a month ago. Family was living at a different residence than the one where everything was found. STEPFA [stepfather – petitioner] does own guns. STD [stepdad] is the president of a gun club and goes to the range and does rapid fire on targets. STD stores his guns properly. STD did have 3 out at the residence where he was not living as he was going to go shooting that weekend. No bullet in chamber he std [sic]. STD believes he was set up. Denies growing marijuana or selling it. CH [child] denies any knowledge of any drugs in home.

> U [Update]: Final overall safety assessment is low as CH is visible in community thru school. No inds [indicators] for substance exposed CH based on no nexus to AV, tho adult subjs being arrested for MJ poss and prod. [production] [N]ote too that AV (& parents) not in the home where drugs found; very credible in her denial of drug use by parents or use as well. No inds for other maltreatments based on subj/collateral contacts and CPI observations that refuted allegations.

(Doc. 1, App. E, p. 109 in ECF).

Petitioner's "new" evidence is of little, if any, value, and certainly does not show actual innocence. To the extent petitioner argues the record of the 2002 DCF investigation is probative because it indicates that M.I. neither disclosed the sexual abuse nor showed signs of sexual abuse in her interactions with petitioner, the

evidence is largely cumulative of what the jury heard from defense witnesses, including family friends and M.I.'s biological uncle. (Ex. C, pp. 297-352; Ex. D, pp. 357-544; Ex. E, pp. 548-68 (defense witnesses' testimony)).

## CONCLUSION

Petitioner's federal habeas petition is time-barred. The court has considered all of the evidence together – the old and the "new" – and concludes that it does not show that "it is more likely than not that no reasonable juror would have convicted" petitioner of the sexual batteries and molestation forming the basis of Counts 1-3. Petitioner's contentions of actual innocence and his "new" evidence fall far short of the *Schlup* standard. Petitioner's evidentiary showing is insufficient to overcome the statute of limitations bar or even to obtain an evidentiary hearing on his gateway actual-innocence claim. *See Sibley*, 377 F.3d at 1206 ("The petitioner must make a threshold showing of actual innocence to warrant a hearing." (internal quotation marks and citation omitted)). Petitioner's untimely habeas petition should be dismissed with prejudice.

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is

issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (*quoting* 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 774, — L. Ed. 2d — (Feb. 22, 2017) (*quoting Miller-El*, 537 U.S. at 327). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595, 1604, 146 L. Ed. 2d 542 (2000) (emphasis added). The petitioner here cannot make the

requisite showing. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1. That respondent's motion to dismiss (doc. 14) be GRANTED.

2. That the petition for writ of habeas corpus (doc. 1), challenging petitioner's judgment of conviction and sentences in *State of Florida v. Robert Russell Taylor*, Escambia County Circuit Court Case No. 06-CF-3199, be DISMISSED WITH PREJUDICE.

3. That the clerk be directed to close the file.

4. That a certificate of appealability be DENIED.

At Pensacola, Florida this 20th day of April, 2017.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.